**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**Houston Division**

| | |
|---|---|
| **FERGUSON ENTERPRISES, INC.** ) | |
| **D/B/A WOLSELEY INDUSTRIAL GROUP** ) | |
|      **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 4:18-cv-01109** |
| ) | |
| **INTERNATIONAL CONCEPT** ) | |
| **MANAGEMENT, INC.** ) | |
| **Serve: William Turner & Holmes, PC** ) | |
|      **Registered Agent** ) | |
|      **744 Horizon Court** ) | |
|      **Suite 115** ) | |
|      **Grand Junction, CO 81505** ) | |
| ) | |
|      **Defendant.** ) | |

## COMPLAINT

Ferguson Enterprises, Inc., d/b/a Wolseley Industrial Group ("WIG"), by and through counsel, states as follows for its Complaint against International Concept Management, Inc. ("ICM").

## PARTIES

1. WIG is a Virginia Corporation with its principal place of business located in Newport News, Virginia.

2. ICM is a Colorado corporation with its principal place of business located in Grand Junction, Colorado.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the matter in controversy exceeds $75,000.00, exclusive of interest and costs, and this action is between citizens of different states.

4.  Venue is proper in this District pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTS PERTINENT TO THE CLAIMS

5.  ICM contracted with the State of Ceará, Brazil to construct a state-of-the art aquarium facility located in Fortaleza, Brazil (the "Acquario Ceará Project" or the "Project"). The aquarium was to be largest of its kind, not only in Latin America, but also in the Southern Hemisphere. Plans for the facility included a 7.5-million-liter ocean tank, 1.5-million-liter shark experience tank, 21 fresh water tanks, a penguin exhibition area, various walk-through fish tank tunnels, and many touch tanks.

6.  ICM contracted with WIG pursuant to a Purchase Contract Goods agreement (the "Purchase Agreement"), to have WIG furnish and install pre-fabricated high-density polyethylene pipe ("HDPE") spools for the Acquario Project.

7.  Later, ICM and WIG entered into a Supplier Agreement dated April 30, 2014 ("the Agreement'), which superseded the Purchase Agreement.

8.  WIG agreed to perform its work for the Acquario Ceará Project in two phases. WIG planned to complete most of its work during Phase 1, which involved fusing and installing the HDPE piping spools for the tanks.

9.  For Phase I of the Project, WIG agreed to build the HDPE piping spools in sections. Those spools would then be loaded into containers for transport to the Project site in Brazil. To install the HDPE piping spools on site, WIG needed certain tools and equipment, including butt fusion machines.

10. ICM directed that the HDPE piping spools fabricated by WIG, and all the tools and equipment necessary for installation of the HDPE piping spools be shipped under ICM's

control and direction to the Project site. The Domestic Shipping Instructions, which is included as Exhibit I to the Agreement, provides that "ICM will hold the responsibility for all shipping from U.S. port to project site."

11. In accordance with ICM's directions and the terms of the Agreement, WIG loaded its HDPE piping spools, along with its tools and equipment, in containers for shipment to the Project site in Brazil. ICM shipped WIG's tools and equipment to the Project site in Brazil and, in so doing, accepted responsibility for ensuring that the importation complied with Brazilian law.

12. Thus, ICM by the terms of its Agreement with WIG, and by its action assumed responsibility and assumed the risk that importation of WIG's tools and equipment into Brazil complied with applicable rules, regulations, and laws of Brazil.

13. WIG satisfactorily completed Phase I of the Acquario Ceará Project.

14. The Agreement provided that WIG's personnel would "vacate the site following hydro test of Phase 1 piping," and all the equipment that WIG did not need for Phase II, including all the butt fusion equipment and accessories, would be returned to WIG's facility in the United States.

15. Upon WIG's completion of Phase I, ICM directed WIG to load its tools and equipment into containers for shipment back to the United States, and WIG complied with ICM's directions.

16. ICM took possession and control of the containers that contained WIG's tools and equipment. In so doing, ICM took full responsibility to safeguard, protect and preserve WIG's tools and equipment left in the containers at the Project site, and it assumed responsibility to

ensure that WIG's tools and equipment were properly exported back to WIG's facility in the United States.

17. After loading its tools and equipment into containers at the Project site, WIG's employees left the Project site with the understanding from ICM's management that WIG had completed Phase I and WIG's tools and equipment would be shipped by ICM to WIG's facility in the United States.

18. ICM left the Project site on May 8, 2015, without returning WIG's tools and equipment to WIG in the United States and without ensuring the safe return of WIG's tools and equipment over which ICM had assumed a duty to safeguard and to ensure return to WIG. ICM continued to represent that the equipment would be returned.

19. Brazilian authorities have refused to permit ICM to export WIG's tools and equipment because ICM failed to ensure that tools and equipment under its possession and control would be properly returned to WIG. ICM has failed to take the actions necessary for the return of WIG's tools and equipment and failed to comply with appropriate law and the contract.

20. By letter dated November 30, 2016, ICM informed WIG that it was terminating the Agreement for convenience.

## WIG COMPLIED WITH ALL CONDITIONS PRECEDENT

21. Under the Agreement, the parties pledged to "participate in good faith in voluntary and non-binding Alternative Dispute Resolution (ADR) procedures in the form of a mediation conducted by a neutral mediator, <u>or such other form as the parties otherwise agree</u>, as a condition precedent <u>to addressing the dispute in any other forum</u> unless the parties agree in writing to waive this condition precedent." Agreement, Art. XVIII (emphasis added).

22. The Agreement further provides that after one party gives the other written notice of request for ADR, then "[w]ithin fourteen (14) days following the receipt of such notice, lead representatives of the Supplier and ICM shall meet in an effort to resolve the dispute." *Id.* The Agreement states that "in the event that such disputes are not resolved by mediation <u>or another ADR procedure as ICM and Supplier may agree</u>, then such disputes shall be resolved in litigation." *Id.* (emphasis added).

23. On September 29, 2017, WIG filed a lawsuit against ICM in the United States District Court for the Eastern District of Virginia, Newport News Division, Civil Action No. 4:17cv121 (the "Virginia Action"), asserting essentially the same claims asserted in this Compliant. WIG did not serve the complaint filed in the Virginia Action on ICM, and therefore, did not seek to have the court "address the dispute between the parties" at that time.

24. Instead, by letter dated October 3, 2017, WIG's counsel sent a letter to ICM's counsel, which attached the complaint filed in the Virginia Action, and which requested that the "lead representatives of ICM and WIG meet within fourteen days following receipt of [the letter] to resolve the parties' dispute." The Letter also informed ICM that WIG would not cause "the Complaint to be served on ICM until after the parties have had an opportunity to resolve this dispute by mediation, unless you indicate to us that ICM elects not to mediate."

25. Shortly afterwards, ICM's counsel sent a letter to WIG's counsel stating that "ICM is willing to mediate this matter in Denver, Colorado," and that as "a practical matter, the logistics for scheduling a mediation date will be difficult to fulfill within fourteen days of October 3, 2017[.]"

26. WIG's counsel later spoke with ICM's counsel and suggested that the principals for both parties participate in a conference call to talk through the issues to see if a mediation

5

would be productive before the parties incurred the time, expense, and cost of attending mediation – particularly given the distances the parties would have to travel. The rationale for this approach, which was discussed, was that if the principals for the parties were too far apart that a mediation would not likely be successful, then it did not make the sense to incur the cost of hiring a mediator and incurring the costs to travel to a mediation.

27. By email dated October 24, 2017, ICM's counsel communicated that ICM was receptive to the approach suggested by WIG's counsel that "the principles of both parties participate in a conference call to talk through the issue/differences before undertaking the time/expense of mediation."

28. In conformity with the parties' agreement, the principals of ICM and WIG participated in a conference call on November 28, 201, along with counsel, where each party discussed their position, as well as the factual and legal basis for their position. WIG made a demand to ICM for an amount to settle the parties' dispute. At the end of the conference call, WIG agreed to provide ICM with additional information, and the parties scheduled a conference call for December 6, 2017.

29. Because of a delay by WIG in obtaining the requested information, the parties' call was rescheduled until after the new year. In the meantime, WIG's counsel communicated to ICM's counsel that WIG needed to serve the complaint no later than January 19, 2018, and asked if ICM's counsel would agree to a waiver of service, which "would give ICM 60 days to file responsive pleadings, in the hopes we can get this settled by then."

30. By email dated December 8, 2017, WIG, through counsel, provided ICM with the additional information it had requested during the conference call.

6

31. By letter dated January 10, 2018, ICM's counsel conveyed ICM's counteroffer. WIG rejected ICM's proposal and made a counter-demand.

32. ICM did not respond to WIG's counter-offer. In response to WIG's request, through counsel, for ICM's response, ICM's counsel communicated via email dated February 1, 2018: "My client does not have a response at this time as the parties are simply too far apart. Instead[,] we will be focusing on preparing to defend against the Complaint."

33. WIG's counsel again requested that the parties mediate their dispute the week of February 19, 2018. ICM's counsel responded that he would follow-up with WIG's counsel after he had a chance to discuss the "mediation condition precedent requirement of contract" with his client. ICM's counsel never followed-up with a response to WIG's subsequent request to mediate.

34. These facts demonstrate that WIG has complied with the terms of the Agreement and that ICM has refused to comply with the terms of the Agreement.

## COUNT I
## BREACH OF CONTRACT

35. WIG incorporates all allegations in the Complaint.

36. WIG and ICM are parties to the Agreement.

37. WIG complied with the terms of the Agreement and performed all its obligations under the Agreement.

38. ICM breached the Agreement by failing to ensure that the importation of WIG's tools and equipment complied with applicable Brazilian rules, regulations, and laws, and by failing to take necessary corrective action to ensure that WIG's tools and equipment could be exported from Brazil to the United States. ICM has also breached the Agreement by failing to pay WIG for all amounts due under the Agreement.

39. ICM further breached the Agreement by failing to pay WIG the "reasonable costs, expenses, commission of demobilization and such other reasonable profits as may be determined by" WIG.

40. WIG has suffered damages proximately caused by ICM's breach of the Agreement that exceed $1,000,000.

## COUNT II
## BREACH OF BAILMENT

41. WIG incorporates by reference all allegations in the Complaint.

42. At ICM's direction, WIG delivered its tools and equipment to ICM for importation into Brazil by placing its tools and equipment in containers for shipment by ICM. ICM took possession of the containers, filed the importation documents, and had the containers delivered to the Project site in Brazil.

43. After WIG completed Phase I of the Project, ICM directed that WIG place its tools and equipment in containers under ICM's possession and control.

44. ICM failed to use ordinary care for the protection, preservation, and return of WIG's bailed property.

45. WIG has demanded that its tools and equipment be returned to it in the United States.

46. ICM failed to return the bailed property to WIG as requested.

47. As a result, WIG has suffered the lost value of the bailed property, and it has lost the rental income the tools and equipment would have generated had they been returned to WIG, as requested.

## COUNT III
## NEGLIGENCE

48. WIG incorporates by reference all allegations in the Complaint.

49. At ICM's direction, WIG delivered its tools and equipment to ICM for importation into Brazil by placing its tools and equipment in containers for shipment by ICM. ICM took possession of the containers, filed the importation documents, and had the containers delivered to the Project site in Brazil.

50. After WIG completed Phase I of the Project, ICM directed that WIG place its tools and equipment in containers under ICM's possession and control.

51. ICM failed to use ordinary care for the protection, preservation, and return of WIG's bailed property.

52. WIG has demanded that its tools and equipment be returned to it in the United States.

53. ICM failed to return the WIG's property, and cannot return the property due to its negligence in the shipping and handling of WIG's property.

54. As a result, WIG has suffered the lost value of its property, and it has lost the rental income the tools and equipment would have generated had they been returned to WIG, as requested.

## COUNT IV
## CONVERSION

55. WIG incorporates all allegations in the Complaint.

56. WIG owned the equipment, tools, and accessories at issue in this case.

57. ICM unlawfully and without authorization assumed and exercised control over the property to the exclusion of, or inconsistent with, WIG's rights as an owner.

58. WIG demanded return of the property but ICM refused to return the property.

59. As a result, WIG is entitled to the return of its property, has suffered the lost value of its property, suffered the loss of rental income the tools and equipment would have generated had they been returned to WIG, as requested.

## DEMAND FOR JURY TRIAL

60. Pursuant to Federal Rule of Civil Procedure 38, Plaintiff WIG hereby demands a trial by jury in the above-captioned action of all issues triable buy jury.

## REQUESTED RELIEF

WHEREFORE, Plaintiff respectfully requests that judgement be entered in its favor and against Defendant as follows:

1. Judgment in favor of WIG in an amount to be determined at trial, but not expected to be less than $1,000,000;
2. Pre-judgement and post-judgment interest;
3. Attorney's fees; and
4. Such other relief as the Court deems necessary and proper.

Dated:   April 9, 2018                         Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　　　　*/s/ B. Lee Wertz, Jr.*
　　　　　　　　　　　　　　　　　　　　　　B. Lee Wertz
　　　　　　　　　　　　　　　　　　　　　　Texas State Bar No. 00797796
　　　　　　　　　　　　　　　　　　　　　　Munsch Hardt Kopf & Harr, P.C.
　　　　　　　　　　　　　　　　　　　　　　700 Milam Street, Suite 2700
　　　　　　　　　　　　　　　　　　　　　　Houston, TX 77002-2806
　　　　　　　　　　　　　　　　　　　　　　Tel:713.222.4051
　　　　　　　　　　　　　　　　　　　　　　Fax: 713.222.1475
　　　　　　　　　　　　　　　　　　　　　　Email:  lwertz@munsch.com

　　　　　　　　　　　　　　　　　　　　**ATTOREY-IN-CHARGE FOR PLAINTIFF**

OF COUNSEL:

Charles M. Sims (VA Bar # 35845)
H. Robert Yates, III, Esquire (VA Bar # 35617)
O'Hagan Meyer, PLLC
411 East Franklin Street, Suite 500
Richmond, Virginia 23219
Tel: 804.403.7100
Fax: 804.237.0250
CSims@ohaganmeyer.com
RYates@ohaganmeyer.com
**Counsel for Plaintiff**

4834-4146-6721v.1